IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

ADDISON EXPRESS, L.L.C.,      *
     *
        Plaintiff      *
     *
v.      *     Civil No. 3:04-CV-1954-H
     *
MEDWAY AIR AMBULANCE, INC.,      *
     *
        Defendant.      *

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff's Post-Trial Brief, filed January 13, 2006; Defendant's Post-Trial Brief, filed January 13, 2006; Defendant's Response to Plaintiff's Post-Trial Brief, filed February 6, 2006; and Plaintiff's Reply to Defendant's Post-Trial Response Brief, filed February 27, 2006.

On December 13-15, 2005, this case for breach of contract was tried before the Court without a jury. For the reasons that follow, final judgment will be entered in favor of Plaintiff Addison Express, L.L.C., for damages in the amount of $ 477,986.37.

## I.  BACKGROUND

This case presents an interaction of facts, contract theory, and statutory law worthy of the final exam of the most diabolical of contract professors. Each party to the contract at issue experienced financial loss and business interruption. In the main, each party conducted itself in the legitimate pursuit of its own business interests. The villain, if there is one, would appear to be a federal drug enforcement agency unaware of, or unconcerned with, the injury that indiscriminate governmental conduct can leave in its wake.

Plaintiff Addison Express, L.L.C., ["ADEX"] is an aircraft charter firm in Addison, Texas. Defendant Medway Air Ambulance, Inc., ["Medway"] operates an airborne medical transport and

ambulance service from its principal place of business in Lawrenceville, Georgia.  On September 5, 2003, ADEX and Medway entered into an agreement ["Lease"] under which Medway leased  for a period of twenty-four months a 1976 Learjet 35, registration number N354LQ ["Lima Quebec"]. ADEX duly delivered Lima Quebec to Medway in October 2003, in full compliance with the Lease terms.  Medway took possession of the aircraft in Addison, Texas, and began making timely lease payments of $19,000 per month.  For approximately the first year, all was well.

The following summer, on or about August 18, 2004, the United States Drug Enforcement Administration ["DEA"] seized Lima Quebec with a warrant issued pursuant to the Patriot Act.  At the time, the aircraft was undergoing regularly scheduled maintenance and inspection by Medway at the Lawrenceville facility.[1]  It had been partially disassembled -- among other things, its landing gear had been removed for overhaul -- and was not airworthy.  The DEA instructed Medway to cease all activity with regard to Lima Quebec.  Medway complied.  Under the same warrant, the DEA seized Lima Quebec's flight logs and maintenance records, which were kept at ADEX's office in Addison.

On August 19, 2004, ADEX notified Medway that it was working to obtain a conditional release from the government so that the interrupted maintenance event in Georgia could resume.  On August 24, 2004, ADEX notified Medway that conditional release had been granted.  Instead of resuming work on Lima Quebec, however, Medway notified ADEX on August 31, 2004, that it was terminating the Lease as a result of the seizure.  Medway made no further lease payments and performed no further work on Lima Quebec.

---

[1]  Specifically, Medway had begun a combination "A," "B," and "C" inspection, as well as a landing gear inspection regularly conducted every 6,000 landings.

On October 26, 2004, ADEX notified Medway that it had been successful on October 22, 2004, in obtaining a full and unconditional release for Lima Quebec.  Grounds for continued possession by the government were not established.  This Court has heard no evidence to this day connecting Lima Quebec with unlawful activity of any kind.

By the October release date, however, Medway -- perhaps spooked by the seizure, and reiterating termination of the Lease -- was in the process of purchasing its own Learjet 35 to replace Lima Quebec.   Still in Medway's physical possession in Georgia, Lima Quebec sat unused and deteriorating; and Medway declined to incur the expense of returning her to Texas.  Over the ensuing month, the parties' attorneys negotiated terms whereby Medway would allow ADEX temporary conditional use of its facility to restore the aircraft to sufficient airworthiness to obtain a permit to ferry her home.  On December 5, 2004, ADEX personnel arrived in Lawrenceville and began work. On December 15, 2004, ADEX ferried Lima Quebec to its facility in Texas to begin the inspection, maintenance, and repairs required to restore her to full service.

This lawsuit was originally brought by ADEX on September 9, 2004, for specific performance of the Lease.  By amendment, ADEX asks for damages for breach of contract in the amount of $580,129.72, including the remaining unpaid Lease payments and costs of restoring the aircraft to service.  In addition, three "side contracts' were entered into between the two parties, on which ADEX claims only partial payment was made.  Medway has filed counterclaims, including breach of the Lease on ADEX's part.

This opinion, in conjunction with the supplementary findings of fact and conclusions of law appended hereto, is the decision of the Court.

## II.  ANALYSIS

The Second Amended Pretrial Order, filed in this case on December 12, 2005, asserts claims by ADEX for breach of the Lease and three "side" contracts, for which ADEX claims damages in the total amount of $582,730, plus interest, costs and attorney's fees.  Medway responds that it owes nothing on the Lease, which it believes to have been terminated following the seizure; and asserts an array of additional defenses both to the Lease (including estoppel, laches, waiver, and failure of consideration) as well as to the side contracts (including merger, statute of frauds, and accord and satisfaction).  Medway further asserts counterclaims for, *inter alia*, return of its $38,000 Lease deposit; for lost profits of $370,000 because of Lima Quebec's unavailability; for hangar storage of $50 per day from August 11, 2004, to December 9, 2004; for expenses of the maintenance interrupted by seizure; for return of its lease payment and insurance premium for the month of the seizure; for costs of finding and modifying a replacement aircraft; for declaratory judgment that the Lease was terminated on August 31, 2004; and for lost profits of $15,391 and damages of $13,000 associated with one of the side contracts; plus interest, costs, and attorney's fees.

Most of the major issues are resolved by analyzing the Lease and its breach.

A.      Breach of the Lease

ADEX's cause of action for breach of the Lease contract is based on three allegations: (1) that Medway failed to make the required payments under the Lease after DEA seizure of Lima Quebec; (2) that Medway failed to buy and maintain required insurance coverage against seizure; (3) that Medway failed to complete required maintenance;  and (4) that Medway failed to return Lima Quebec to ADEX in the same condition as received, except for normal wear, and with a current U.S. Certificate of Airworthiness.  On all of these counts, the Court agrees with ADEX.

4

Under Texas law,[2] the elements of a claim for breach of contract are (1) that a valid contract exists; (2) that the complaining party performed or tendered performance; (3) that the defendant breached the contract; and (4) that the complaining party suffered damages as a result of the breach. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 288 (5th Cir. 2004). Because the contract in question is a commercial lease, the transaction is governed by Chapter 2A of the Texas Business & Commerce Code, which is a verbatim codification of the Uniform Commercial Code -- Leases ["UCC"]. *See* TEX. BUS. & COMM. CODE § 2A.101.[3]

In this case, the parties do not dispute that the first element is met. The Lease as executed is a valid, bargained-for contract; and the Court so finds. *See* Pl. Ex. 1 (Lease). The negotiated monthly lease rate of $19,000 reflects, among other things, that ADEX would continue to operate Lima Quebec under ADEX's Part 135 Certificate;[4] that ADEX modified Lima Quebec to suit Medway's specialized purpose; that Medway assumed the obligation of insurance and all required maintenance; and that Medway agreed to keep Lima Quebec in airworthy condition. *See id*.

---

[2] The parties do not dispute, and the Lease specifies, that Texas law governs this case. Art. XIX, at 13; *see DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677-78 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991).

[3] The UCC provisions are designated by hyphenated number (*e.g.*, 2A-101), and the Texas statutory provisions are designated by the same number, except with a period in place of the hyphen (*e.g.*, 2A.101). The Court uses the designations interchangeably.

[4] Aircraft such as Lima Quebec offered for charter to the public are regulated by the Federal Aviation Administration ["FAA"] and must be maintained under an Air Carrier Certificate, which requires among other things, professional flight crew training (including background checks and mandatory drug and alcohol screening), and maintenance and flight documentation. ADEX's agreeing to keep Lima Quebec operating under ADEX's Part 135 Air Carrier Certificate was not an unusual occurrence in the industry. It resulted in economic and temporal efficiencies to Medway and required ADEX to retain regulatory operational responsibility to the FAA for the aircraft.

With regard to the second element of breach of contract, the Court finds from a preponderance of the evidence that ADEX tendered performance of the Lease by delivering Lima Quebec to Medway in October 2003 in full compliance with the Lease terms. Medway accepted performance at that time. 1 Tr. at 38, 43.

Medway argues in opposition that because of the interrupted possession by Medway of the aircraft after the seizure, delivery failed. Medway proposes, in effect, that a 24-month lease term requires twenty-four separate consecutive deliveries of the item. Medway cites no case law directly supporting this notion, and the Court finds none. The UCC contemplates such multi-delivery agreements, called "installment lease contracts." Under UCC Section 2A-103, an installment lease contract "authorizes or requires the delivery of goods in separate lots to be separately accepted." TEX. BUS. & COMM. CODE § 2A.103(a)(9). In our case, the Lease requires a single delivery of a single "good," and thus cannot be construed as an installment contract. Moreover, "delivery" is defined in the UCC as "voluntary transfer of possession." TEX. BUS. & COMM. CODE § 1.201(14). Possession of Lima Quebec was transferred to Medway in October 2003. At that time, ADEX fulfilled its delivery obligation fully.

Moving to the third requirement for a breach of contract claim, the Court addresses the core issues in the case. Medway defaulted under the Lease in at least three ways: (1) failure to make the required lease payments; (2) failure to buy and maintain insurance against governmental seizure; and (3) failure to maintain the aircraft and to return it to ADEX in airworthy condition. Each of these breaches will be addressed in the discussion that follows.

1.      Payments, Causation and Risk

Articles I and II of the Lease require Medway to make twenty-four rental payments of $19,000 each. It is undisputed that Medway made only twelve. *See* Lease, art. I at 1 (term of Lease);

Lease art. II, at 1 (payment amount and frequency).  Medway argues that seizure of Lima Quebec by the DEA excused further payment.  The Lease by its own terms, however, contradicts that argument:

> Obligations for payments under this Lease shall continue notwithstanding any unavailability to Lessee of the Aircraft for use by the lessee (except for total destruction of the Aircraft) during the term of this Lease after delivery and acceptance of the Aircraft as provided for herein, *provided that the unavailability of the Aircraft was not caused by Lessor*, its officers, directors, shareholders, servants, agents or employees.

Lease, art. XX at 13 (emphasis added).  Once having accepted the aircraft, Medway was responsible under Article XX for lease payments even if the aircraft became unavailable for use, *unless* that unavailability was "caused by" ADEX.  The facts underlying the aircraft's seizure thus come into play.

On or about August 9, 2004, shortly before seizure of Lima Quebec, another Learjet registered to ADEX, N354PM ["Papa Mike"], was seized in Teterboro, New Jersey, in conjunction with certain of its alleged passengers' arrest on a charge of drug trafficking.  Lima Quebec's seizure was apparently based on a "guilt by association" theory.  No drug trafficking on Lima Quebec was ever charged.  None of the arrestees' names appeared on ADEX's passenger lists.  However, the individual who paid for the charter of the Papa Mike flight that ended in seizure was a customer of ADEX who had also chartered Lima Quebec on prior occasions.  There is no evidence before the Court that this individual was ever arrested or charged in the Papa Mike incident.  And like Lima Quebec, Papa Mike was eventually released unconditionally back to ADEX.

The question before the Court is whether Lima Quebec's seizure was "caused by" ADEX.  Medway proposes a cause-in-fact analysis with a "but for" or "substantial factor" standard.  *See Excel Corp. v. Apodaca*, 81 S.W.3d 817, 820 (Tex. 2002).  Under that standard, Medway does not suggest that ADEX encouraged the seizure.  Rather, Medway reasons that but for ADEX's prior

chartering of Lima Quebec to the individual whose charter of Papa Mike ended in its Teterboro seizure, Lima Quebec would not have been seized. This tortured reasoning must fail.

The Texas Supreme Court has recently spoken to clarify the concept of causation under Texas law. *E.g.*, *IHS Cedars Treatment Center of DeSoto, Texas, Inc. v. Mason,* 143 S.W.3d 794, 798-800 (Tex. 2003) ["*IHS*"]. The elements of proximate cause are "cause in fact," plus the additional element of foreseeability. *Id.* Cause in fact is established "when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* (citations omitted). Citing the Restatement (Second) of Torts, the *IHS* court explains:

> [I]t is not enough that the harm would not have occurred had the actor not been negligent.... [T]his is necessary, but it is not of itself sufficient. The negligence must also be a *substantial factor* in bringing about the plaintiff's harm.

*Id.* (emphasis added). To be a substantial factor of causation, conduct must do more than "furnish a condition" that makes an injury possible. *Id.* (citing *Boys Clubs*, 907 S.W.2d at 477); *see Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968). Under the required analysis, conduct of a defendant "may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm." *Id.*

This case presents the epitome of attenuation. From the evidence at trial, the Court finds no causal connection between ADEX's conduct and the DEA seizure. With regard to the transactions in evidence, ADEX conducted its business in a lawful and reasonable manner.[5] A legal act cannot "cause" a punitive law-enforcement response. Medway argues that a warrant for seizure of an aircraft may issue without regard for the complicity of its owner. *See, e.g.*, 21 U.S.C. § 881. That

---

[5] Nothing in the Court's findings is intended to insulate ADEX from continued vigilance with regard to the identity and conduct of its charter clients.

argument, however, begs the question of causation.   The premise that an act may occur notwithstanding an owner's conduct does not invite the conclusion that the conduct caused the act. In this case, seizure was caused by allegations of drug trafficking (in conjunction with a very broad net cast by the DEA).   ADEX, by exercising its right to charter aircraft to the public in the normal course of lawful business, merely furnished the condition that made injury due to seizure a possibility.   Cause-in-fact is thus absent.

This result is confirmed by the Court's obligation to interpret the Lease "in an effort to harmonize and give effect to all provisions of the contract."   *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996), *cert. denied*, 519 U.S. 1078 (1997) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)); *see generally* Restatement (Second) of Contracts § 203(a) (1981).   Under Medway's logic, virtually any unavailability of Lima Quebec connected with the almost thirty-year-old aircraft's history might well be blamed on an everyday decision made or adopted by ADEX in the past.   This expansive reading of the phrase "caused by" contradicts the parties' intent to shift the risk of loss of the aircraft – full or partial, via seizure or otherwise – to Medway.   *See* Lease, art. V at 3 ("All risk of Loss shall be upon Lessee from the date of delivery and acceptance of the Aircraft until the date of return to Lessor."); *id*. art. VIII at 5 (requiring Medway to insure Lima Quebec against all risks); *id.* art. VIII(2)(D) at 6 (requiring Medway to pay ADEX $1,800,000 in the event of an uninsured total loss); *see also id*. art. XI at 10 (indemnifying ADEX, except for loss caused "solely" by ADEX's own negligence or intentional act).

Medway argues that the Lease's several loss-allocating provisions should be rendered void as violating the Uniform Commercial Code.   Section 2A.219 of the Code states the general rule for assigning risk of loss as to leased goods:   "Except in the case of a finance lease, risk of loss is retained by the lessor and does not pass to the lessee."   Tex. Bus. & Comm. Code § 2A.219(a).

Under this provision, Medway argues that ADEX must retain the risk of loss or unavailability of the aircraft, regardless of the parties' agreement to the contrary.  The Court disagrees.

It is a fundamental tenet of commercial contract law that parties with equal bargaining power may allocate risk as they see fit.  *See* 1 White & Summers, Uniform Commercial Code § 5-1 (4th ed. 1995 & Supp. 2006) (construing Chapter 2 of the UCC  to "invite[] any lawyer who drafts a contract for the sale of goods to include a clause that specifically allocates the risk of loss between the buyer and the seller"); *see generally* 1 Farnsworth on Contracts § 1.9 (UCC).  Moreover, the general provisions of the UCC so contemplate:  "The effect of provisions of this title may be varied by agreement, except as otherwise provided in this title."  TEX. BUS. & COMM. CODE § 1.102(c); *accord id*. § 2A.301 ("Except as otherwise provided in this title, a lease contract is effective and enforceable according to its terms . . .."); *id*. § 1.302(c) cmt. 3 ("[T]he general and residual rule is that the effect of all provisions of the Uniform Commercial Code may be varied by agreement.").  Interpreting other chapters of the UCC, the Fifth Circuit has weighed in with strong policy favoring freedom of contract.  *See, e.g.*, *Jon-T Chems., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1416 (5th Cir. 1983) ("[W]hen the parties have contracted and negotiated a specific agreement, the Code's provisions do not control.").

Section 2A.219 contains no language requiring its application notwithstanding the parties' agreement to the contrary.  At the same time, the absence of the affirmative "unless otherwise agreed" modifier is unimportant.  *See id* § 1.102(d) ("The presence in certain provisions of this title of the words 'unless otherwise agreed' or words of similar import does not imply that the effect of other provisions may not be varied by agreement under Subsection (c).").  Most tellingly, provisions subsequent to Section 2A.219(a) expressly deal with contracts, whether in a finance lease or otherwise, in which the lessee has assumed, or will assume, the risk of loss.  *E.g.*, *id*. § 2A.220(a)

("Where risk of loss is to pass to the lessee . . .."); *id*. § 2A.220(b) ("Whether or not risk is to pass

to the lessee, [if lessee defaults under specified circumstances], the lessor, or, in the case of a finance

lease, the supplier . . . may treat the risk of loss as resting on the lessee for a commercially reasonable

time."); *id*. § 2A.219(b) ("[I]f risk of loss is to pass to the lessee and the time of passage is not

stated . . ..").

Although no case law is directly on point, the decisions that have addressed the "risk of loss"

interplay between the UCC and a non-finance commercial lease inferentially support ADEX. *E.g.*,

*Fluid Concepts, Inc. v. DA Apts. Ltd. Partnership*, 159 S.W.3d 226, 229-30 (Tex. App.--Dallas 2005,

no writ hist.); *Hunt v. Air Cargo Masters, Inc*., 1998 WL 1780690, at *5 (D.N.D. 1998).  In *Fluid

Concepts*, a Texas appellate court had the opportunity, and ultimately declined, to invoke Section

2A.209 to assign the risk of loss of goods (which had mysteriously disappeared during the lease

term) to a lessor as a matter of law.  *See* 159 S.W.3d 226 at 229-30 (reversing summary judgment

in favor of the lessee).  In *Hunt*, the federal district court did not address the question of applicability

of UCC Section 2A-219.  However,  in that aircraft lease dispute, the court  enforced provisions

similar to the ones here that effectively shifted 100% of the risk of loss of the aircraft to the lessee.

*See* 1998 WL 1780690, at *5 (holding the lessor to be indemnified).

The more reasoned view is, and the Court so holds, that Section 2A.119 (UCC Section 2A-

119) may be varied by agreement between a lessor and lessee to shift the risk of loss of the subject

goods to the lessee.  In this case, the parties' agreement to shift the loss of Lima Quebec to Medway

is valid and enforceable.

Returning to the question of whether the DEA seizure was "caused by" ADEX, the Court

reiterates that the broad and simplistic "but for" analysis proposed by Medway both flies in the face

of Texas causation law, and undercuts the parties' intent generally to shift the risk of loss or partial

loss of the aircraft to Medway.  Because by its prior public charters ADEX merely created the condition that made harm possible, its conduct does not satisfy Texas's substantial factor test."[6]  *IHS,* 143 S.W.3d at 800.  Under Article XX of the Lease, Medway remained responsible for lease payments despite Lima Quebec's unavailability; and the failure to make those payments constitutes a breach of the Lease.  *See* Lease, art. IX(1) at 8 (defining default).

2.       Termination, Repudiation, and Insurance

Medway argues next that by letter of August 31, 2004, it terminated the Lease.  *See* Pl. Ex. 4.  As a result, Medway reasons, no further obligations were due.  After consideration of the evidence and argument of counsel, however, the Court concludes that Medway's attempted termination was ineffective.  The Lease does not provide for such unilateral action.  On the contrary, the Lease disallows modification to its term except by written instrument executed by both parties, and makes no provision for early termination by either side.  *See* Lease, art. XV at 11; *see also* TEX. BUS. & COMM. CODE § 2A.208(b) ("[A] signed lease agreement that excludes modification or rescission except by a signed writing may not be otherwise modified or rescinded.").

Finding no authority for unilateral termination within the four corners of the Lease, Medway turns instead to the Uniform Commercial Code.  Section 2A.405, entitled "Excused Performance," provides in relevant part:

> Delay in delivery or nondelivery in whole or in part by a lessor or a
> supplier . . . is not a default under the lease contract if performance as

---

[6]  The Court does not reach the question whether to apply the remainder of a proximate cause analysis, with its additional element of foreseeability.  However, at trial credible testimony was offered that in the aircraft charter business, governmental seizure – whether in this country or internationally -- is generally regarded as a known (and insurable) hazard.  *See* 1 Tr. 156-57. This reality is all the more reason why the parties' express, bargained-for allocation to Medway of the risk of a contemplated injury should not be rendered meaningless by a back-door determination that ADEX somehow "caused" the governmental conduct.

> agreed has been made impracticable by . . . compliance in good faith
> with any applicable foreign or domestic governmental regulation or
> order, whether or not the regulation or order later proves to be invalid.

TEX. BUS. & COMM. CODE § 2A.405(1).  Applied to the facts of our case, this section would operate

to excuse ADEX from default due to the DEA seizure.  Applicable only to a "lessor or supplier," this

section does not address Medway's nonperformance as lessee.  However, Section 2A.405(1) is

amplified by a subsequent provision:

> If the lessee receives notification of a material or indefinite delay . . .
> justified under Section 2A.405, the lessee may by written notification
> to the lessor as to any goods involved . . . terminate the lease contract
> (Section 2A.505(b)).

TEX. BUS. & COMM. CODE § 2A.406(a)(1).  Thus Medway argues that ADEX's timely notification

of the DEA seizure constitutes "a material or indefinite delay," authorizing Medway under Section

2A.406(a)(1) to terminate the lease entirely.  The Court agrees that the seizure qualifies as an

indefinite delay, and that the letter of August 31, 2004, is sufficient notice under the statute.  While

plausible on its face, however, Medway's position has insurmountable flaws.

First, the "material or indefinite delay" of Section 2A.406 is a direct reference to "delivery"

under Section 2A.405.  In this case, delivery of Lima Quebec was tendered and accepted many

months before the event occurred that gave rise to the alleged termination.  Because these UCC

sections address scenarios of non-delivery or delay in delivery only, they do not apply to the facts

here.

Second, Medway's reliance on Section 2A.406(a)(1) neatly ignores the controlling fact that

the parties negotiated a different solution to the possibility of seizure.  Under Lease provisions

discussed in more detail below, Medway was to obtain insurance covering "seizure of the Aircraft,

confiscation and war risk."  Lease, art. VIII(1)(C) at 5.  Moreover, in the event of an uninsured

seizure or "detention by any government" resulting in total loss, Medway was to pay ADEX full hull

value. Lease, art. VIII(2)(D) at 6.  Relevant here, too, is the parties' agreement that Medway would continue to be obligated under the Lease without regard to the aircraft's unavailability.  Lease, art. XX at 13.  In the face of these express provisions, the Court concludes that Section 2A.406(a)(1) was varied by agreement  under the facts of this case.  *See* TEX. BUS. & COMM. CODE § 1.102(c).

Absent authorization under either the Lease or the UCC, then, Medway's letter was insufficient to terminate the Lease.  *See* TEX. BUS. & COMM. CODE § 2A.103(a)(26) ("Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the lease contract otherwise than for default.").  Instead, the letter can be construed only as an anticipatory repudiation of further performance of Medway's obligations.  *See* TEX. BUS. & COMM. CODE § 2A.402(1), (3).  Such repudiation is itself an independent breach of contract.  *Id.*; *see Murray v. Crest Constr. Co.*, 900 S.W.2d 342, 344 (Tex. 1995) (per curiam).  As of August 31, 2004, ADEX was authorized to "resort to any right or remedy on default under the lease contract" or to pursue any other remedy under the UCC.  TEX. BUS. & COMM. CODE § 2A.402(3).

Even if, however, the Court were to accept Medway's letter as a Section 2A.406 termination, ADEX's right to sue for default remains unaffected. Section 2A.406, in granting the right of a lessee to terminate a lease, refers expressly to Section 2A.505(b) for illumination of the word "terminate." Section 2A.505(b) provides: "On termination of the lease contract, all obligations that are *still executory on both sides* are discharged but any right based on a prior default or performance survives."  TEX. BUS. & COMM. CODE § 2A.505(b).  This section has two implications here.  First, with regard to the emphasized language above, ADEX's delivery of the aircraft was not executory. ADEX had already performed.  Thus, Medway's reciprocal obligations cannot be discharged by termination.

Second, and even more importantly, Medway was already in default before it attempted to terminate the Lease.  Article VIII of the Lease, entitled "Insurance," required Medway to buy and maintain insurance coverage against seizure of the aircraft.  The Lease provides:

> 1.  Lessee shall secure and maintain in effect throughout the term hereof insurance policies . . . covering said Aircraft as follows: . . .
>
> C.     Coverage for seizure of the Aircraft, confiscation and war risk with Lessor named as primary beneficiary.

Lease, art. VIII(1)(C) at 5.

Despite this obligation, Medway failed to secure insurance coverage for seizure.  At trial, Rick Moore, the president of Medway, admitted that he had agreed under Article VIII(1)(C) of the Lease to provide such insurance.  2 Tr. at 5-12.  No credible evidence was adduced that seizure insurance is impossible to obtain.  Instead, Moore testified that Medway is "careful" where it flies; that the company avoids high-risk areas of the world; and that when Medway flies internationally, it secures a bond to protect from loss of its aircraft.  For all of these reasons, Moore decided that Medway did not need insurance for governmental seizure, and he chose not to obtain it.  *Id*. Nowhere in the Lease, however, is the concept of "seizure" limited to an act of foreign governments. The parties clearly intended the term to include all governmental seizure, both foreign and domestic.

As a proposed excuse for what amounts to a decision to self-insure, Moore asserted from the witness stand that he believed Article VIII(2)(D) of the Lease to make seizure insurance optional. That belief is patently incorrect.  Article VII(2)(D) provides:

> In the event the Aircraft should be declared a total loss, or disappear for any reason including but not limited to theft, or confiscation, seizure, or detention by any government or embezzlement, secretion, or conversion by anyone in possession of the Aircraft, or totally destroyed or irreparably damaged or permanently rendered unfit for use from any cause whatsoever, and further in the event there exists no valid and collectible insurance under any insurance policy, [Medway] shall pay to [ADEX] . . . One Million Eight Hundred

> Thousand U.S. Dollars ($1,800,000.00) as damages for the loss or destruction of the Aircraft, in addition to any other damages or remedies available hereunder or at law or in equity.

Lease, art. VIII(2)(D) at 6 (emphasis deleted).

Nowhere does this clause relieve Medway of any obligation to secure insurance. Instead, it provides ADEX with expanded protection in the event Medway were to lose Lima Quebec entirely in some event not covered.[7] The clause expressly reserves ADEX's right to pursue legal remedies for breach, without excluding default for failure to buy insurance, *in addition* to the named amount for an uninsured total loss. Moreover, the subsequent paragraph reinforces the insurance requirement by imposing a waiver of any claim by either party related to a loss that is insured. *See* Lease, art. VIII(2)(E) at 6-7. The Court finds nothing in the facts, the Lease, or the law that excuses Medway from its express obligation to provide seizure insurance. Indeed, by that simple expedient, both parties' injuries (and this lawsuit) could have been prevented.

That ADEX did not demand a copy of the policy to confirm the seizure insurance has no effect on the outcome. Medway cites no authority, and the Court can conceive of none, requiring a party to police compliance with a contract before claiming breach. *Cf.* TEX. BUS. & COMM. CODE § 2A.502 ("Except as provided by this chapter or the lease agreement, [a party] in default under the lease contract is not entitled to notice of default or notice of enforcement from the other party to the lease agreement."). Nor can there be any question that failure to provide seizure insurance was an act of default. Article IX list seven paragraphs that "shall constitute events of default hereunder." Paragraph Six specifies default "[i]f Lessee shall fail to procure or maintain the insurance coverage prescribed herein." Art. IX(6), Lease at 8.

---

[7] Ironically, had ADEX not persevered and succeeded in its determined effort to obtain release of Lima Quebec from the government, Medway would likely have been liable under this clause for the stated value of the aircraft.

At trial, Defendant drew the Court's attention to a notification requirement within Article IX. It is undisputed that ADEX never notified Medway of a default due to failure to insure prior to the seizure. (Indeed, ADEX did not know that Medway failed to insure, and did not receive a copy of the policy until discovery commenced in this case. *See* Pl. Ex. 20.) Upon closer reading of Article IX, however, the Court determines that the notification requirements refer only to Paragraphs One and Two, not to the Paragraph Six insurance provision. *See* Lease, art. IX(1), (2) at 8. Of the seven paragraphs defining seven separate default events, each one is separately numbered and separated by the disjunctive "or." Paragraph One defines its default event as failure to make lease payments. Paragraph Two is a catch-all provision, designating default if "Lessee shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder," if such default continues unremedied after written notice. Lease, art. (IX)(2) at 8. Neither of those paragraphs can reasonably be read to modify the Paragraph Six default for failure to provide insurance, which, like the remaining five designated default events, contains no notification requirement.

Having established that Medway was in default under the Lease from its inception, the Court revisits Section 2A.505(b) of the UCC. Under that section, termination of a lease cannot extinguish "any right based on a prior default." TEX. BUS. & COMM. CODE § 2A.505(b). Thus ADEX would still retain its right to sue for breach of the Lease, an express remedy for which is acceleration and payment of all obligations. See Lease, art. X at 9. Accordingly, whether or not Medway's letter can be said to have terminated the Lease under UCC Section 2A.406 (and the Court holds that it did not), Medway would still owe ADEX for the Lease's remaining term.

At this point, the Court has found three material breaches of the Lease -- Medway's failure to make the final twelve monthly payments; its failure to provide seizure insurance; and its

anticipatory repudiation of the Lease by letter of August 31, 2004.  The Court turns now to the final

alleged breach, failure to maintain the aircraft and to return it in airworthy condition.

      3.     Maintenance and Return

     With regard to maintenance of Lima Quebec, Medway assumed total responsibility under the

Lease:

> All inspections, repairs, modifications, FAA directives . . . shall be
> performed by Lessee at Lessee's expense by persons licensed or
> authorized by Lessor to perform such work . . ..
>
> In addition to the foregoing undertaking, Lessee agrees at all times to
> keep the Aircraft in a fully operative condition and completely
> airworthy . . ..

Lease, art. VII at 4.

     With regard to the ultimate return of Lima Quebec to ADEX, the Lease required Medway

to do so at Medway's expense:

> The Aircraft . . . shall be returned to Lessor at Lessee's expense at
> Lessor's hangar at Addison Airport . . . on the date of termination of
> this Lease as specified in Article I.  Lessee shall return the Aircraft to
> Lessor (1) in the same condition as received, except for normal wear,
> and (2) with a current U.S. Certificate of Airworthiness.

Lease, art. III at 2.  Under this article, Medway further agreed that Lima Quebec would be in good

and airworthy condition at the time of return.

     The Court finds by a preponderance of the evidence that Medway did not complete required

maintenance; did not maintain Lima Quebec in airworthy condition after the seizure; and never

returned Lima Quebec to ADEX.  As detailed in the Appendix to this opinion, the maintenance event

begun by Medway before the seizure was never resumed.  Instead, Lima Quebec was kept by

Medway after the seizure in a disassembled, non-airworthy, and deteriorating condition until,

following proper notice under the Lease terms, ADEX recovered the aircraft at its own expense.

Accordingly, Medway breached Article III of the Lease and is liable to ADEX for the remedy designated therein.

4.      Medway's Counterclaims and Defenses

Only one remaining Lease issue requires discussion.  Medway claims that ADEX breached the Lease by violating its "quiet enjoyment" clause.  Under Texas law, when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.  *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc*., 134 S.W.3d 195, 196 (Tex. 2004) (citing *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex.1994)).  Medway raises this allegation as both a defense to its failure to continue the Lease's performance, and as a counterclaim for which it claims damages.

Article XVII of the Lease reads in relevant part:

> Provided that no Event of Default . . . shall have occurred and be continuing, Lessor agrees and covenants that Lessee shall and may peaceably and quietly have, hold and enjoy the Aircraft, during the term of this Lease, free from repossession or disturbance by Lessor or its officers, agents, employees or servants, or by anyone claiming through or under them.

.
Lease, art. XVII(2) at 12.  Pursuant to this article, Medway asserts that the seizure and its aftermath violated Medway's right of possession under the Lease.  The assertion fails, however, by the article's own terms.  As the Court has already found, the "disturbance" was not perpetrated by ADEX or anyone claiming through them.  Moreover, an "Event of Default" – failure to insure – had already occurred and was ongoing.  The Court concludes that ADEX did not breach Article XVII, or any other provision.

For each of Medway's remaining defenses and counterclaims, the factual or legal basis has been disposed of above or in the Appendix to this opinion.  Medway's defenses and counterclaims are therefore dismissed without further discussion.

As a final note, the Court feels compelled to acknowledge a sense of some unfairness in requiring Medway to bear the full brunt of an injury that was the direct result of conduct by unrelated third parties. However, the Lease contemplated and provides for such an event. The contract was entered into by two commercial parties of equal bargaining power. By executing the Lease and accepting its benefits, Medway agreed to accept the risk of loss (or partial loss) that might be caused by seizure. Medway then magnified that risk by choosing to roll the dice instead of to insure against it. Medway rightly bears the burden, therefore, of paying for the loss that occurred.

B.      Damages for Breach of Lease

As damages for breach of the Lease, ADEX petitions the Court for the remaining twelve lease payments; late fees; recovery and inspection costs, unreported engine-hour payments, and loss of use of Lima Quebec. The Court awards all but the late fees and loss of use; and it reduces recovery and inspection expenses by the amount of Medway's deposit.

The remedies for all events described as "default" under the Lease were negotiated by the parties to include "all remedies provided at law [or] in equity," including "an amount equal to the aggregate of all sums payable" during the Lease term. Lease, art. X at 9. Article II requires Medway to pay monthly payments of $19,000, plus a late fee of 10% in the event payment was made more than ten days after its due date. Lease, art. II at 1. Upon default of Medway, Article X allows ADEX to accelerate the Lease and "declare the full amount if rental payments for the remaining term hereof immediately due and payable." Lease, art. X at 9.

In opposition, Medway argues that the measure of damages for breach is "the present value of the future rentals that would accrue under the lease contract, reduced by the reasonable cash market value of the lease for the unexpired term." Df. Resp. at 2 (citing landlord-tenant cases). In the presence of an agreed measure of damages reflected in the Lease terms, Medway's formulation

is rejected.   Article X has no requirement of using a discount rate in accelerating the Lease terms.

The Court deems the Lease to have been accelerated as of September 7, 2004, upon filing of this

lawsuit.[8]   As of that date, the accelerated payments were not "future damages," but were present

damages, governed by the terms of the Lease.   *Cf. Taylor Pub. Co. v. Systems Marketing, Inc.*, 686

S.W.2d 213, 217 (Tex. App.--Dallas 1984, writ ref'd n.r.e.) (awarding present value under the

common law, in the absence of a governing contract clause).   Accordingly, the full amount of

$228,000 is awarded.

The late fee, however, is problematic.   Under the acceleration clause, the due dates for the

monthly payments were never actually reached; late fees were thus not incurred.   Although some

might argue that "never paid" is certainly "late," a strict interpretation of the Lease does not support

an award of the late-fee penalties.

In addition to rental payments, the Lease required Medway to pay $280.94[9] per engine hour

(for both engines combined) into a Maintenance Service Plan, in which funds are accumulated to

defray periodic engine maintenance costs.   *See* Lease, art. II(4) at 2.   An approximate 28.5 hours

---

[8]   The filing of this lawsuit was triggered by Medway's anticipatory repudiation of August 31, 2006.   ADEX's Complaint alleges the rental payment damages.   *See* Pl. Orig. Cmp., at 4.   At that time, the twelve unpaid rental payments were payable, and Medway had the responsibility to return the aircraft (or to retract its repudiation and resume its obligations under the Lease.)   *See* TEX. BUS. & COMM. CODE § 2A.402(1), (3).   Damages flowing from failure to pay the rental payments accrued at that time.   Damages flowing from failure to maintain, restore, and return Lima Quebec also accrued at that time, though their dollar amount could not be determined until the work was actually accomplished.   ADEX's November 2004 recovery notice to Medway under the Lease constitutes a "commercially reasonable time" to have waited for Medway to retract the repudiation.   *See id.* § 2A.402(1), (3).   ADEX was entitled to wait for such retraction while at the same time pursuing its legal remedies.   *Id.*

[9]   Although credible testimony exists that a new rate of $318 per hour was in effect for the relevant time period, and the Lease does provide for a possible change of rate, the Court declines in the absence of written modification to depart from the original Lease terms.   *See* Lease, art. XV at 11; *id.* art. II(4) at 2.

were unreported, unpaid and due under the Lease at the time of seizure. *See* Pl. Ex. 2; 1 Tr. at 119-122.  Accordingly, $8,006.79 is awarded.

ADEX also claims damages in the amount of $40,000 for installation of a Terrain Awareness and Warning System ["TAWS"].  The FAA required certain aircraft to install TAWS by a deadline of March 2005.  2 Tr. at 67, 87-88.  If the Lease had run its course, and if Medway had continued to fly the aircraft after March 2005 (and if the FAA had not granted exemption or extension), Medway would have been responsible for such installation.  *See* Lease, art. VII at 4.  Like the late fees, however, the deadline for this expense was not reached before the Lease was accelerated.  For that reason, as well as for absence of proximate causation, this element of damages fails.  *See Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981) (discussing causation of contract damages).

As for the expenses associated with returning Lima Quebec to ADEX in good and airworthy condition, the Lease provides:

> All expenses of the return of the Aircraft to Lessor shall be borne by the Lessee.  In the event Lessee does not return the Aircraft in such condition, Lessor may make any necessary repairs to restore the aircraft to such condition, provided, however, Lessor has first notified Lessee of the necessary repairs and Lessee has not implemented such repairs after ten (10) days from the [*sic*] of the notice thereof.  Lessee agrees to reimburse Lessor for any expenses related to such restoration in cash, upon demand or Lessor may deduct such costs from the security deposit.

Lease, art. III. at 2.

ADEX having given proper notice under this section, Medway is obligated to pay all expenses incurred by ADEX "related to" the aircraft's "restoration" and return.  *See id*.  The Court finds, as set out in more detail in the Appendix, the total of $267,526.52 that ADEX expended to be a commercially reasonable and necessary amount.  *See* Pl. Ex. 14, 15, 23, 36, 40; 1 Tr. at 84-111,

122-136; 2 Tr. at 86-87; 3aTr at 5-7, 25, 29. Medway disputes many of the expenses, particularly certain amounts for room and board of ADEX personnel while in Georgia recovering the aircraft. However, it was Medway that made the trip necessary by failing to return Lima Quebec as promised. Engine reinstallation costs, too, along with landing gear recovery costs, are disputed. Those amounts, as set out more fully in the Appendix, as well as the amounts expended for additional inspection, repair, and replacement of parts, flow directly from Medway's breach and are deemed commercially reasonable under all the circumstances.

As to ADEX's damage claim for loss of use of Lima Quebec, however, the Court reaches a different result. ADEX asks for $150,000 to compensate it for five months' profits lost because of Medway's failure to return the aircraft in the promised condition. That claim is denied in part for failure of proof with reasonable certainty. *Hiller v. Manufacturers Prod. Research Group of N. Am., Inc.*, 59 F.3d 1514, 1526 -1527 & n.27 (5th Cir. 1995) (discussing the standard for awarding lost profits under Texas law). It is also denied in part as giving ADEX more than the benefit of its bargain. Under long-established overarching principles of contract law, the measure of damages for breach of a contract is the amount necessary to return a plaintiff to the financial position in which it would have been had the contract been performed by both parties. *See, e.g.*, *Comex Intern. v. Norfolk S. Ry. Co.*, 2006 WL 355230, *5 (S.D. Tex. 2006); *Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 725 (Tex. App.--Houston [1st Dist.] 1984, no writ hist.); *see generally* 1 Farnsworth on Contracts § 2.1 (3rd. ed. 2004). In this case, the profits for which ADEX asks would flow from ADEX's use of the aircraft during five months for which its expectation would instead have been Medway's rental payments. The full benefit of ADEX's expectation, to the extent it was proved at trial and justified under the Lease, has already been awarded.

There remains the question of Medway's $38,000 deposit, paid to ADEX on taking delivery of Lima Quebec.  *See* Lease, art. II(2) at 1-2.  The Lease forbids using the deposit to offset rental payments.  *See* Lease, art. II(2) at 2.  However, the Lease does contemplate the deposit to be used to offset any amount ADEX might be required to spend to restore the Aircraft to airworthy condition.  *See* Lease, art. X(1) at 2.  Accordingly, the Court subtracts Medway's $38,000 security deposit from the amount due for recovery of the aircraft.

In sum, the damages that flow from Medway's breaches of the Lease come to $ 465,533.31, and that amount will be awarded to ADEX by final judgment to issue separately.

C.    Breach of "Side Agreements"

In addition to the Lease, ADEX has sued for breach of three oral agreements between the parties.  In about May 2004, ADEX and Medway made an oral agreement that ADEX would manage three of Medway's aircraft, N81AX, N132HS, and N283KA ["Management Agreement"].  Under that agreement, ADEX fully performed its obligation and invoiced Medway for a total of $9,223.81.  *Id*.; 1 Tr. at 111-12.  Medway paid only $2,891.00.  Def. Ex. 3, 9, 10

In June or July 2004, ADEX and Medway made an oral agreement that ADEX would perform at Medway's expense certain maintenance on Lima Quebec identified when the aircraft's engines were removed for periodic maintenance in Houston, Texas ["Maintenance Agreement"].  ADEX fully performed its obligation and billed Medway $9,515.81.  *Id*.; Pl. Ex. 17.  Medway paid only $4,895.56.  Def. Ex. 2, 7, 8.

In July 2004, ADEX and Medway made an oral agreement that Medway would pay for ADEX's chief pilot to conduct a check ride for a Medway pilot ["Training Agreement"].  1 Tr. 117-

24

18, 215.  ADEX fully performed its obligation and billed Medway for $1,500.[10]  Pl. Ex. 18; 1 Tr. at 117-18.  Medway did not pay this invoice.  *Id.*

Opposing liability for these payments, Medway argues two colorable defenses: (1) statute of frauds; and (2) accord and satisfaction.  Neither prevails.

Under the "statute of frauds" section of the UCC, a contract for the sale of goods for the price of $500 or more is not enforceable unless written.  TEX. BUS. & COMM. CODE § 2.201(a).  Medway contends that each of the first two Agreements contain sales of goods in excess of the designated amount and are thus unenforceable because they are oral agreements only.  The Court finds, however, that the Management Agreement and Maintenance Agreement are hybrid contracts with the predominant purpose of providing services.  *See Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 899 & n.5 (5th Cir. 2004).  The Training Agreement is wholly a service contract.  All three are thus outside the UCC and not subject to its requirements.  *See id.*

A second statute of frauds under Texas law requires the presence of a writing to enforce an agreement "which is not to be performed within one year from the date of making the agreement."  TEX. BUS & COMM. CODE 26.01(b)(6).  The Maintenance Agreement and Training Agreement reflect discrete events that were intended to be and were wholly performed within one year.  *See* 1 Tr. at 112-120.  The statute of frauds is therefore inapplicable.

The Management Agreement, in contrast, was of indefinite length.  Under Texas law, contracts of indefinite length which may be performed within one year fall outside the statute if an agreement  "can cease upon some contingency, other than by some fortuitous event or the death of one of the parties."  *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 184 (5th

---

[10]   An additional $247 in expenses was shown at trial to be unconnected with the Training Agreement.  *See* 1Tr. at 17-18; Pl. Ex. 19.

Cir.1995); *see Just Add Water, Inc. v. Everything But Water, Inc*., 2005 WL 1206874, *2 (N.D. Tex. 2005). Here, the oral Management Agreement had no minimum duration. Nothing about it suggests that it could not have been terminated at any time within the year by agreement or for cause. Indeed, it was. *See* Def. Ex. 88. Accordingly, the statute of frauds does not apply. *See Floors Unlimited, Inc.*, 55 F.3d at 184-85.

Because Medway made partial payments on the Management Agreement and the Maintenance Agreement, Medway contends that an accord and satisfaction occurred and that no further payment is due. Under the law of accord and satisfaction, parties may agree to discharge a legitimately disputed, existing obligation for an agreed amount. *See Boland v. Mundaca Inv. Corp*., 978 S.W.2d 146, 148 (Tex. App.--Austin 1998, no pet.); *Indiana Lumbermen's Mut. Ins. Co. v. State*, 1 S.W.3d 264, 266 (Tex. App.--Fort Worth 1999, writ denied). An "accord" is a bargain evidenced in a new contract, either express or implied, that replaces an old agreement. *Ostrow v. United Bus. Mach., Inc.*, 982 S.W.2d 101, 104 (Tex. App.-- Houston [1st Dist.] 1998, no pet.). A good faith dispute as to liability on the underlying obligation furnishes sufficient consideration, and the satisfaction is the actual performance of the new agreement. *See id.*; *Hycarbex, Inc. v. Anglo-Suisse, Inc.*, 927 S.W.2d 103, 110 (Tex. App.--Houston [14th Dist.] 1996, no writ).

In this case, Medway establishes that a dispute existed with regard to payment of the full amount of ADEX's invoices for the Management Agreement and Maintenance Agreement. *See* Def. Ex. 2 (hotly disputing the Maintenance Agreement charges); Def. Ex. 3 (hotly disputing the Management charges). Medway tendered partial payment, and ADEX deposited that payment. *See* Def. Ex. 7, 8, 9, 10. The question is whether by accepting the partial payment, ADEX agreed that the invoice was satisfied in full.

Acceptance of a payment is binding if from the surrounding facts a party "obviously should understand that a check is tendered in full satisfaction." *Roylex, Inc. v. S&B Engineers, Inc.*, 592 S.W.2d 59, 60 (Tex. Civ. App.--Texarkana 1979, no writ).  With regard to the Management Agreement, Medway's letter of August 13, 2004, lists disputed charges and informs ADEX: "I am enclosing a check for $2891, which I think is fair for what was done. . . . If you disagree with any of my reasoning please feel free to call me." Def. Ex. 3.  The door was thus left open for continued negotiations and challenge.  Seizure of Lima Quebec occurred shortly thereafter, and the parties may or may not have intended to resume squabbling over this bill.  As a result, the Court cannot infer from this correspondence that ADEX accepted the tendered payment as full satisfaction of the debt. *See Lopez v. Munoz, Hockeman & Reed, L.L.P.*, 22 S.W.3d 857, 863 (Tex. 2000).

With regard to the Maintenance Agreement, the Court reaches a similar result.  Medway's letter of August 12, 2004, which accompanies partial payment of ADEX's invoice #609, disputes certain charges and ends: "Therefore I am enclosing a check for $4895.56 which represents what my cost would have been to perform these items. . . . I truly believe this invoice is out of line, and I feel I do not owe the full amount.  I hope after your review you will agree that I am correct in my thinking." Def. Ex. 2.  Again, the Court must conclude that negotiations were left open and that the amount tendered cannot be understood to be a full and final payment.  *See Lopez*, 22 S.W.3d at 863. This finding is supported by a copy of ADEX's invoice crediting the payment and showing a balance remaining due and payable.  *See* Pl. Ex. 17.

Accordingly, Medway is liable to ADEX for the remaining amounts on the "side" contracts as follows: for the Management Agreement, $6,332.81; for the Maintenance Agreement, $4,620.25; and for the Training Agreement, $1,500.00.

## III.  CONCLUSION

Pursuant to this opinion and the Supplemental Findings of Fact and Conclusions of Law appended hereto, judgment will be entered in favor of Plaintiff ADEX for $ 477,986.37, plus interest as allowed by law.  Costs of court will be borne by Defendant Medway.  *See* FED. R. CIV. P. 54(d).

Plaintiff's counsel is **DIRECTED** to confer with Defendant's counsel and to submit by **noon, May 26, 2006**, an agreed form of final judgment consistent with this order.

This opinion is interlocutory in nature and is not subject to appeal until entry of final judgment.

SO ORDERED.

DATED: May 19, 2006.

BAREFOOT SANDERS, SENIOR JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

ADDISON EXPRESS, L.L.C.,                    *
                                            *
            Plaintiff                       *
                                            *
v.                                          *        Civil No. 3:04-CV-1954-H
                                            *
MEDWAY AIR AMBULANCE, INC.,                 *
                                            *
            Defendant.                      *


**APPENDIX TO MEMORANDUM OPINION AND ORDER**

**SUPPLEMENTAL FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

1.      Diversity of citizenship is complete, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court thus has jurisdiction over this matter.

2.      In addition to the findings set out in this Appendix, the Court finds to be true from a preponderance of evidence the factual matters set out and/or necessarily relied on in the preceding Memorandum Opinion and Order.

3.      Addison Express, L.L.C. ["ADEX"] and Medway Air Ambulance, Inc. ["Medway"] entered into an Aircraft Lease Agreement ["Lease"] regarding Learjet Model 35, FAA Reg. No. N354LQ ["Lima Quebec" or "Aircraft"], dated September 5, 2003.

4.      The Lease is a valid and enforceable contract.  *See* Pl. Ex. 1.

5.      ADEX and Medway are commercial entities with equal bargaining power.  The Lease terms were negotiated by the parties.

6.      The Lease provided that ADEX deliver the aircraft to Medway with (1) fresh A through D inspections; (2) all inspection and/or replacement items (due within 3 months, 100 hours or 100 landings) completed; (3) the interior reconfigured to accommodate a stretcher system; and (4) a repaired headliner, repaired plastic surrounding the emergency exit and repaired interior accessory lights.

7.      The Lease provided that Medway keep the Aircraft in a fully operational condition and completely airworthy.

29

8.  The Lease provided that if Medway did not return the Aircraft in the same condition as received, except for normal wear and tear, ADEX could make any necessary repairs, at Medway's expense, to restore the Aircraft to said condition after giving Medway ten days notice.  Medway did not so return Lima Quebec.  ADEX provided appropriate notice and made the necessary repairs.

9.  The Lease provided that Medway pay ADEX $19,000.00 per month in advance for each monthly rental period for the Aircraft ["rental payments"].

10.  The Lease provided that rental payments began on the day of the Aircraft's delivery and were payable on the same day of the following months. The Lease further provided that Medway would pay a late charge of 10 percent if Medway failed to make a payment within 10 days of the due date.

11.  The Lease provided that Medway's obligations for rental payments continued notwithstanding the unavailability of the aircraft to Medway (except for the Aircraft's total destruction) after the Aircraft's delivery and acceptance, provided the unavailability was not caused by ADEX, its officers, directors, shareholders, servants, agents or employees.

12.  The Lease provided that Medway pay ADEX two hundred and eighty dollars and ninety-four cents ($280.94) per flight hour Medway operated the Aircraft with payment due each month with the monthly rental payment.

13.  The Lease provided that Medway pay $38,000.00 as security deposit upon taking delivery of the aircraft. Medway paid ADEX $38,000.00 when it took delivery of the aircraft.

14.  The Lease provided that Medway obtain insurance coverage in the amount of one million eight hundred thousand dollars ($1,800,000.00) for loss of the Aircraft as a result of the Aircraft's seizure and/or confiscation, with ADEX named as the primary beneficiary.

15.  ADEX delivered the aircraft to Medway in October 2003 in accordance with the terms of the Lease.  Medway accepted the delivery.

16.  ADEX performed all of its obligations under the Lease.

17.  On or about August 18, 2004, the Federal Drug Enforcement Administration ["DEA"] seized the Aircraft pursuant to a federal warrant.  ADEX seasonably notified Medway of the seizure.

18.  At that time the Aircraft was undergoing regularly scheduled maintenance that would have taken approximately two to four weeks to complete, and could not have been completed before the first week of September 2004.

19.  Neither the issuance of the seizure warrant for Lima Quebec nor the seizure itself was caused by ADEX, its officers, directors, shareholders, servants, agents, or employees.

20.     On August 19, 2004, the government conditionally released the Aircraft so that the maintenance in progress could be completed.

21.     Between August 21 and September 3, 2004, Medway participated in negotiations with ADEX for ADEX to find and obtain for Medway's use a substitute aircraft that was substantially equivalent to Lima Quebec, pending its release.  ADEX obtained such an aircraft  prior to the time Medway could have completed Lima Quebec's maintenance. ADEX offered the substantially equivalent aircraft to Medway to use pending release of Lima Quebec, and Medway rejected the offer.

22.     Medway failed to mitigate its damages by refusing to accept ADEX's offer of substitute aircrafts in the form of a Learjet 25 and a Learjet 35, whether or not those aircraft were operated under ADEX's Part 135 Certificate.

23.     The actions of the DEA did not cause Medway to be without the use of the Aircraft or a substantially equivalent substitute except for a short period, during which the Aircraft would have been grounded for maintenance anyway.

24.     On August 31, 2004, Medway notified ADEX that Medway's obligations under the Lease were "terminated" by the Aircraft's seizure.

25.     Medway did not make any monthly lease payments as required by the Lease after August 2004.

26.     ADEX obtained the unconditional release of the Aircraft from the government on October 21, 2003, and it so notified Medway on October 26, 2004.

27.     On October 26, 2004, the Aircraft was not in operational or airworthy condition.

28.     Pursuant to Article III, Paragraph 1, of the Lease, on November 12, 2004, ADEX notified Medway by fax and certified mail of the necessary repairs to the Aircraft and that ADEX would exercise its contractual right to repair the Aircraft to restore it to its operational and airworthy condition unless Medway did so.

29.     On November 12, 2004, ADEX demanded return of Lima Quebec.

30.     Between December 5 and December 15, 2004, ADEX maintenance personnel traveled to Lawrenceville, Georgia, and inspected and reassembled the Aircraft sufficiently to enable it to be flown back to Texas. ADEX pilots flew the Aircraft back to Texas on December 15, 2004.  The cost to reassemble and recover the Aircraft was $113,915.86.  Pl Ex 36.

31.     The recovery cost of $113,915.86 was reasonable and necessary.  ADEX personnel were allowed only limited use of Medway's facility to restore Lima Quebec to suitable condition to fly back to Texas.  As a result, ADEX personnel restored a Learjet 35 from the back of a rented Suburban, with basic tools stored and transported to Georgia therein.  They were

prevented by Medway from discussing the aircraft's maintenance status with Medway mechanics. The landing gear had been removed as part of the interrupted inspection. ADEX paid approximately $31,000 to retrieve the aircraft's landing gear from Duncan Aviation ["Duncan"], an independent company Medway had hired to inspect and overhaul the gear off-site, and which had placed a lien on the aircraft pending payment for its work. Medway did not pay Duncan. ADEX paid for transportation of the landing gear from Duncan's facility in Lincoln, Nebraska, to Georgia; and ADEX installed the landing gear

32.  As the photograph exhibits show, certain parts were damaged and missing from the aircraft when ADEX personnel arrived to retrieve it. The rotator beacon was missing. A bucket was catching a running fuel leak. The engines were not on the aircraft. The cockpit seats were out. Wheel and brake parts were lying on the ground, along with interior cabin components. The brake on Lima Quebec was not a Lear 35 brake. The circuit breaker panel from the cockpit had been removed and was in a box on the floor. A fairing was broken and taped to the top of the wing. Missing parts included radar, circuit breakers, pedestal, seats, and some avionics. The line to the cockpit oxygen indicator was broken. Floorboards were disassembled. Engine cowling was on the floor. Seventy-pound 28V batteries were missing. Lines and leads were cut. Pl Ex 23 (photographs); 1 Tr. at 84-111.

33.  When ADEX personnel arrived to pick up Lima Quebec, the aircraft was disassembled to a degree exceeding what would have been required for the maintenance event Medway had been conducting at the time of the seizure.

34.  With regard to the engines having been taken off the aircraft, the Court finds as follows: In standard industry practice, Lima Quebec's engines had been removed by Garrett Aviation ["Garrett"], a facility in Houston, Texas, for maintenance on or about May 20, 2004, months prior to the seizure. In standard industry practice, Garrett had installed "loaner" engines on Lima Quebec pending maintenance the original engines. Sometime after the seizure, Garrett returned Lima Quebec's completed engines and retrieved its "loaner" engines to be used elsewhere. Normally, Garrett would have reinstalled and tested the original engines. Because Lima Quebec was disassembled, up on jacks, and thus not airworthy at the time of the return, Garrett was unable to perform its usual installation procedures. Accordingly, the engines were not put back on the aircraft. Garrett's inability to reinstall the engines was a direct result of Medway's failure to complete Lima Quebec's required maintenance and to reassemble the aircraft. 1 Tr. at 120-25.

35.  After the landing gear was reinstalled, the aircraft was towed to Aircraft Specialists ["AS"] for the remainder of the reassembly. To be allowed to rent a hangar at Aircraft Specialist, ADEX was required to hire two AS mechanics.

36.  From December 15, 2004 to March 1, 2005, ADEX employees completed work on the Aircraft sufficient to restore it to the same condition as when ADEX delivered the Aircraft to Medway. Pl Ex 36; 1 Tr. at 84-111.

37.  The cost ADEX incurred after return to Addison to restore Lima Quebec to the condition she was in at delivery, apart from normal wear, was reasonable and necessary. The cost includes

completion of the interrupted maintenance.  Core parts were damaged or missing and had to be replaced.  Because of the overall condition of the aircraft as found in Georgia, ADEX personnel were justifiably reluctant to take the condition of any part for granted.  Certain work able to be done only as a stop-gap to ferry the aircraft back to Texas had to be redone once back at ADEX's facility under the more favorable conditions there.  1 Tr. at 84-111.

38.  If Medway had installed a Terrain Awareness and Warning System on Lima Quebec, it would have installed a basic unit for $18,000.  2 Tr. 67, 87-88.

39.  Medway breached the Lease by failing to make the required rental payments after August 2004.

40.  Medway breached the Lease by failing to return the Aircraft at Medway's expense to ADEX in the same condition, apart from normal wear, as Medway had received the Aircraft, and with a current Certificate of Airworthiness.

41.  ADEX is entitled to recover damages for unpaid rent in the amount of $228,000, which represents $19,000 per month for 12 months.  *See* Lease, art. II at 1.

42.  Reasonable and necessary expenses paid to recover the Aircraft and restore the Aircraft to the same condition as when ADEX delivered the Aircraft to Medway total $267,526.52.

43.  During Medway's use of Lima Quebec, the aircraft was flown significantly more hours and landed significantly more times than average for a normal charter.  Medway's use was not unusual for an air ambulance.

44.  Medway completed no documented maintenance after July 2004.

45.  Medway breached the Lease by failing to procure the insurance coverage required by the Lease.

46.  Prior to the DEA seizure, Medway did not furnish ADEX with a copy of the insurance policy for Lima Quebec.  Instead, it provided only a "certificate" of insurance from which it is not possible to determine whether seizure was covered by the policy.

47.  Addison was unaware that Medway had failed to buy and maintain seizure insurance until after seizure occurred.  Medway did not furnish ADEX with a copy of the insurance policy until discovery commenced in this case.

48.  Defendants contention that Article VIII(2)(D) of the Lease excuses failure to insure is incorrect.  That section provides additional protection to Addison in the event, for whatever reason, seizure insurance does not exist or does not cover an event resulting in total loss.  *See* Lease, art VIII(2)(D) at 6.

49.  Risk of loss due to seizure was a bargained-for term of the Lease.

50.     When Medway flies internationally, it obtains a bond to protect against seizure, and it avoids war-risk areas.  Medway made a business decision not to obtain seizure insurance, even though it understood the Lease to require it.

51.     Upon recovery of the Aircraft, ADEX determined that Medway failed to report and pay for 28.5 flight hours for which Medway operated the aircraft prior to the Aircraft's seizure.  1Tr. at 119-122; Pl. Ex. 2.

52.     In or about May 2004, ADEX and Medway made an oral agreement that ADEX would manage three of Medway's aircraft, N81AX, N132HS, and N283KA [the "Management Agreement"].

53.     The Management Agreement was capable of being performed in less than one year.  *See Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 184 (5th Cir.1995).

54.     Under the Management Agreement, ADEX performed inspection and maintenance services on N283KA.  ADEX performed all of its obligations under the Management Agreement.

55.     Medway breached the Management Agreement by failing to pay ADEX for services rendered to inspect and maintain N283KA under the Management Agreement.  ADEX is entitled to recover damages for Medway's breach of the Management Agreement in the amount of $6,332.81.

56.     In or about June 2004, ADEX and Medway made an agreement that ADEX would perform certain maintenance on the Aircraft at Medway's expense [the "Maintenance Agreement"] identified when the Aircraft's engines were removed for periodic maintenance.

57.     The Maintenance Agreement was capable of being performed in less than one year.  *See Floors Unlimited, Inc.,* 55 F.3d at 184.

58.     Under the Maintenance Agreement, ADEX performed maintenance and repairs to the Aircraft.  ADEX performed all of its obligations under the Maintenance Agreement.

59.     Medway breached the Maintenance Agreement by failing to pay ADEX all sums due under the Maintenance Agreement.  ADEX is entitled to recover damages for Medway's breach of the Maintenance Agreement in the amount of $4,620.25.

60.     In or about July 2004, ADEX and Medway made an agreement that ADEX would provide pilot training and a "check ride" to one of Medway's pilots at Medway's expense [the "Training Agreement"].

61.     The Training Agreement was capable of being performed in less than one year.  *See Floors Unlimited, Inc.*, 55 F.3d at 184.

62.     ADEX performed all of its obligations under the Training Agreement.  ADEX provided pilot training and a check ride to Medway's pilot, the value of which was $1,500.00.

34

63.     Medway breached the Training Agreement by failing to pay ADEX all sums due under the Training Agreement.  ADEX is entitled to recover damages for Medway's breach of the Training Agreement in the amount of $1,500.00.

64.     With regard to the three "side" Agreements, the evidence does not support novation.  *See Vickery v. Vickery*, 999 S.W.2d 342, 356 (Tex. 1999).

65.     Because the three oral "side" agreements concerned matters separate and apart from the Lease of Lima Quebec, the agreements are not barred by merger.  *See* Lease, art. XVII, at 13 ("Entire Agreement").

66.     Medway did not prove that ADEX breached any of the side agreements; and did not prove lost profits relating to any of those agreements with reasonable certainty.  *See Hiller v. Manufacturers Prod. Research Group of N. Am., Inc.*, 59 F.3d 1514, 1526 -1527 & n.27 (5th Cir. 1995).

67.     The seizure of the Aircraft was not a breach by ADEX of the covenants set forth under Article XVII(2) of the Lease.

68.     Medway is not entitled to the defense of laches as to any of ADEX's claims.  *See Rogers v. Ricane Enter., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989); *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964).

69.     Medway is not entitled to the defense of waiver as to any of ADEX's claims.  *See Sun Exploration and Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765 (Tex. App.--Texarkana 1992, writ denied).

70.     Medway did not prove by a preponderance of the evidence that ADEX failed to mitigate its damages.

71.     Section 2A.221 of the Uniform Commercial Code does not apply to the facts of this case. Among other reasons, the risk of loss passed to Medway under the Lease before the seizure occurred.  *See* TEX. BUS. & COMM. CODE § 2A.221.